**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

ALEXIS FENNESSY, BARBARA GRAZIOLI, WILLIAM WOLF, CHRISTINA HILL, BRIAN TROESCH PARVEEN SANGHA, ROZALIYA RIPA, MITCHAH WILLIAMS, SHARON MANIER, AND DILIP SOMAVARAPU,
on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

DOLLAR TREE, INC.,
DOLLAR TREE STORES, INC.,
DOLLAR TREE SOURCING COMPANY, LLC, AND
GREENBRIER INTERNATIONAL, INC.,

Defendants.

Case No: ________

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiffs Alexis Fennessy, Barbara Grazioli, William Wolf, Christina Hill, Brian Troesch, Parveen Sangha, Rozaliya Ripa, Mitchah Williams, Sharon Manier, and Dilip Somavarapu (collectively, the "Plaintiffs"), individually and on behalf of the Classes defined herein of similarly situated consumers, bring this class action against Defendants Dollar Tree, Inc. ("Dollar Tree"), Dollar Tree Stores, Inc. ("Dollar Tree Stores"), Dollar Tree Sourcing Company, LLC ("DT Sourcing"), and Greenbrier International, Inc. ("Greenbrier International"), and allege the following:

## INTRODUCTION

1. This is a case about fairness. In 2025, President Trump imposed illegal tariffs. Defendants passed through the cost of those tariffs to their customers, in whole or in part, on thousands of products. Thus, *Plaintiffs* and other customers covered the tariff costs that Defendants incurred. Yet after the tariffs were struck down by the Supreme Court, *Defendants* began receiving a refund of the tariffs they paid—even though they had already recouped those sums. As a result, Defendants are receiving a double recovery: They paid tariffs, recovered those costs from their customers, and yet are recovering those costs again from the U.S. government. Plaintiffs and the Class they seek to represent, however, paid inflated prices because of illegal tariffs. Defendants have not agreed to refund the overpayments to Plaintiffs and other customers who paid the price hikes attributable to tariffs—and have strongly suggested to their investors that they will not do so. This case seeks to prevent Defendants from retaining a windfall at the expense of Plaintiffs and the Class.

2. Starting in February 2025, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") to issue a series of executive orders that imposed sweeping new tariffs on imports from virtually every U.S. trading partner.

3. Companies proceeded to pass through all or some of these IEEPA tariffs to consumers across the United States. The companies frequently were explicit that they were raising prices due to the IEEPA tariffs—telling their customers, investors, and the media that the IEEPA tariffs were the reason they chose to increase prices, at a time when many of their customers already were struggling financially and reeling from the inflation of the previous several years.

4. In February 2026, the Supreme Court found the IEEPA tariffs unlawful.

5. Thousands of companies that paid IEEPA tariffs have filed claims for reimbursement. The total amount of refunds is estimated at $166 billion plus interest. The U.S. government has already repaid many billions.

6. But most consumers have received nothing.

7. That is because the vast majority of those companies have tried to avoid returning to their customers the additional amounts those customers paid due to the illegal tariffs, despite receiving refunds from the U.S. government for those same amounts.

8. Dollar Tree is one of those companies. Dollar Tree is among the nation's largest discount retailers, generating more than $19 billion in net sales last year. Dollar Tree (in its own capacity and through its wholly owned subsidiaries Dollar Tree Stores, DT Sourcing and Greenbrier International) raised its prices on thousands of products in response to the IEEPA tariffs, and collected tens and even hundreds of millions from its customers to offset those tariffs. It marked thousands of items with a special sticker to indicate that those items would be subject to price hikes. Its CEO admitted that it raised prices—for just the second time in the company's history—to recoup these tariff expenses from Plaintiffs and the Class.

9. Nevertheless, Dollar Tree then pursued a refund of tariff costs from the U.S. government: By its own admission in public filings, Dollar Tree has already received $383 million in IEEPA tariff refunds and interest from the U.S. government through August 1, 2026. And yet Dollar Tree has stated publicly that it will use this money "to strengthen our business" but has not returned any of that money directly to its own customers who paid tariff surcharges on its goods. Moreover, Dollar Tree booked this revenue as profit and did not book any debts from these sums—unlike UPS and FedEx, which received tariff refunds but also added to their financial statements a liability to customers, stemming from the moral obligation to refund excessive payments to

customers. In other words, Dollar Tree plans to keep—not to pass along to customers—the tariff refund. This lawsuit is Plaintiffs' only chance to get a fair result.

10. By retaining both the amounts paid by customers to absorb the tariffs and the refunds they received from the U.S. government for those same tariffs, Defendants are trying to enjoy a double recovery—at their customers' expense.

11. The law of unjust enrichment exists to prevent precisely this kind of windfall: the retention of two recoveries for a single expense. Defendants' retention of both the tariff-related amounts collected from their customers and the corresponding tariff refunds constitutes unjust enrichment (and, in the alternative, money had and received or breach of contract), as well as violations of several state consumer protection laws.

12. Plaintiffs and the members of the Class seek restitution of the tariff overcharges they paid, along with all other damages, fees, and costs to which they are entitled under the law.

13. Defendants had every right to seek a refund from the government for the unlawful tariffs. They have no right, however, to obtain that refund and retain the amounts they have recovered or will recover for those same unlawful tariffs. What might have been compensation for a legitimate business expense if Defendants did not already pass through these tariff expenses has become a windfall. Plaintiffs respectfully ask the Court to require Defendants to disgorge those twice-recovered funds and return them to the customers who actually bore the cost.

## PARTIES

14. Plaintiff Alexis Fennessy is a resident of Newport News, Virginia. She is a U.S. citizen who is domiciled in the Commonwealth of Virginia.

15. Plaintiff Barbara Grazioli is a resident of Maple Shade, New Jersey. She is a U.S. citizen who is domiciled in the State of New Jersey.

16. Plaintiff William Wolf is a resident of Freedom, Pennsylvania. He is a U.S. citizen who is domiciled in the Commonwealth of Pennsylvania.

17. Plaintiff Christina Hill is a resident of Amherst, New York. She is a U.S. citizen who is domiciled in the State of New York.

18. Plaintiff Brian Troesch is a resident of Chicago, Illinois. He is a citizen who is domiciled in the State of Illinois.

19. Plaintiff Parveen Sangha is a resident of North Royalton, Ohio. She is a U.S. citizen who is domiciled in the State of Ohio.

20. Plaintiff Rozaliya Ripa is a resident of Round Rock, Texas. She is a U.S. citizen who is domiciled in the State of Texas.

21. Plaintiff Mitchah Williams is a resident of Marietta, Georgia. He is a U.S. citizen who is domiciled in the State of Georgia.

22. Plaintiff Sharon Manier is a resident of Riverside, California. She is a citizen of the State of California.

23. Plaintiff Dilip Somavarapu is a resident of Folsom, California. He is a permanent resident of the United States, and a citizen of India.

24. Defendant Dollar Tree, Inc. ("Dollar Tree") is a publicly traded Virginia corporation with its principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320. Dollar Tree operates more than 9,000 retail stores throughout the United States. Dollar Tree operates stores in this District and in each of the Districts in which the Plaintiffs reside.

25. Defendant Dollar Tree Stores, Inc. ("Dollar Tree Stores") is a Virginia corporation with its principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320. Dollar Tree Stores is a wholly owned subsidiary of Dollar Tree, Inc. Dollar Tree Stores operates the Dollar Tree retail business in the United States, including the Dollar Tree stores at which Plaintiffs

and members of the Classes purchased merchandise. Dollar Tree Stores operates stores in this District and in each of the Districts in which the Plaintiffs reside.

26. Defendant Dollar Tree Sourcing Company, LLC ("DT Sourcing") is a Virginia limited liability company also with its principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320. DT Sourcing is a wholly owned subsidiary of Dollar Tree that serves as an importer of record for merchandise imported on behalf of and to be sold in Dollar Tree retail stores. DT Sourcing imports merchandise for sale through Dollar Tree's nationwide network of retail stores, including stores located in this District and in each of the Districts in which the Plaintiffs reside.

27. Defendant Greenbrier International, Inc. ("Greenbrier International") is a Delaware corporation with its principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320. Greenbrier is a wholly owned subsidiary of Dollar Tree and serves as a sourcing and purchasing company for the Dollar Tree enterprise. Greenbrier purchases and imports merchandise for sale through Dollar Tree's nationwide network of retail stores, including stores located in this District and in each of the Districts in which the Plaintiffs reside.

**JURISDICTION AND VENUE**

28. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Dollar Tree.

29. All Plaintiffs other than Plaintiff Somavarapu establish jurisdiction under 28 U.S.C. § 1332(d)(2)(A). Plaintiff Somavarapu establishes jurisdiction in the alternative under 28 U.S.C. § 1332(d)(2)(B).

30. The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

31. The Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 because an actual controversy exists between the parties regarding Defendants' obligation to return to their customers sums those customers paid in IEEPA tariff surcharges.

32. This Court has personal jurisdiction over Defendants because Dollar Tree, Dollar Tree Stores, and Greenbrier International are incorporated under the laws of Virginia and maintain their principal place of business and corporate headquarters within this District, and DT Sourcing is a Virginia limited liability company also with its principal place of business in Virginia. Accordingly, this Court may exercise personal jurisdiction over Defendants with respect to the claims of Plaintiffs and the putative Class, including claims arising from purchases made outside Virginia.

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in this District. Defendants maintain their principal place of business and corporate headquarters in Chesapeake, Virginia, within the Eastern District of Virginia (in the Norfolk Division), and each of their contacts with this District would be sufficient to subject them to personal jurisdiction if this District were a separate State. *See* 28 U.S.C. § 1391(c)(2), (d). Venue also is independently proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including decisions about passing tariffs through to customers and the receipt of such payments and the receipt of tariff refunds. Plaintiff Alexis Fennessy also is a resident of this District and purchased products from Dollar Tree retail stores in this District during the Class Period.

## FACTUAL BACKGROUND

### I. The IEEPA Tariffs

34. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 et seq., is a federal statute that authorizes the President to regulate certain economic transactions during a declared national emergency.

35. On February 1, 2025, President Trump invoked IEEPA through executive orders to impose additional tariffs on goods imported from Canada, Mexico and China. Those orders went into effect for China on February 4, 2025, and for Mexico and Canada on March 4, 2025.

36. In the ensuing weeks, President Trump expanded the IEEPA tariffs through a series of other executive orders.

37. In particular, on April 2, 2025, President Trump—calling the date "Liberation Day"—signed an executive order that expanded IEEPA tariffs substantially, resulting in the imposition of tariffs on the vast majority of consumer goods imported into the United States from nearly every country in the world.

38. One economic analysis calculated that the tariffs announced on April 2 covered 86% of U.S. imports.[1]

39. The IEEPA tariffs have varied by country of origin and product type.

40. For many imported goods, the baseline tariffs were set at 10%.

41. Imports from dozens of other countries were subject to substantially higher cumulative tariffs that, in the case of China, reached as high as 145%.

42. Under U.S. customs law, the importer of record is the party legally responsible for entering imported goods into the United States and paying any applicable IEEPA tariffs. The

[1] McKibbin, Noland & Shuetrim, *The Global Economic Effects of Trump's 2025 Tariffs*, PIIE Working Paper 25-13, at 2 (June 2025).

importer of record, either directly or through a licensed customs broker acting as its agent, was required to pay the IEEPA tariffs to U.S. Customs and Border Protection ("CBP") when the merchandise entered the United States or shortly thereafter.

43. The vast majority of importers of record passed all or some of the tariff costs on to consumers.

44. A June 2025 analysis by the Federal Reserve Bank of New York found that approximately 75% of the surveyed manufacturers and service firms facing tariff-related cost increases chose to pass at least some of those costs along to their customers through higher prices.[2]

45. Likewise, a November 2025 working paper by researchers at the Harvard Business School Pricing Lab found that prices "began rising immediately after the broader tariff measures announced in early March and continued to increase gradually over subsequent months, with imported goods rising roughly twice as much as domestic ones."[3]

46. An April 2026 analysis by The Budget Lab at Yale University estimated, using its preferred methodology, that importers in the aggregate had passed through 86% of the new 2025 tariff costs to consumers on core consumer goods—such as household goods, toys, appliances, and other everyday merchandise—by January 2026.[4]

47. In other words, companies that sold the sort of consumer goods that Dollar Tree sells generally recovered the supermajority of their tariff costs by raising prices on consumers. They were largely made whole even without receiving refunds from the United States of tariffs that were eventually held to be illegal.

---

[2] *See* Jaison R. Abel et al., *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Liberty St. Econ. (Fed. Rsrv. Bank of N.Y. June 4, 2025).
[3] Alberto Cavallo, Paola Llamas & Franco M. Vazquez, *Tracking the Short-Run Price Impact of U.S. Tariffs*, NBER Working Paper No. 34496 (Nov. 2025).
[4] The Budget Lab at Yale, *Tracking the Economic Effects of Tariffs* (Apr. 1, 2026).

## II. Dollar Tree Passes Its IEEPA Tariffs Through to Its Consumers

48. Dollar Tree was founded in 1986. Dollar Tree is one of the largest discount retailers in the United States, with approximately $19.4 billion in net sales in fiscal year 2025. Through its more than 9,000 retail stores across the United States, Dollar Tree sells an enormous range of everyday consumer goods, including food and beverages, household and cleaning products, health and personal-care items, toys, clothing and accessories, home decor, school and office supplies, and seasonal merchandise.

49. Dollar Tree sells its products to 100 million households in the United States.[5] Nearly all of Dollar Tree's revenue is produced from sales in the United States.

50. Dollar Tree also is one of the largest importers of consumer goods into the United States.

51. The Journal of Commerce ranked Dollar Tree as the ninth-largest U.S. importer by volume in 2024.[6] On information and belief, it approximately retained this rank for the Class Period discussed below.

52. Dollar Tree's wholly owned subsidiaries DT Sourcing Co., LLC and Greenbrier International, Inc. serve as the importer of record for merchandise then sold in Dollar Tree retail stores.

53. Direct imports account for approximately 40% of the retail value of purchases at Dollar Tree.[7]

54. China is the source of the vast majority of the direct imports at Dollar Tree.[8] This was true when the IEEPA tariffs went into effect and throughout the Class Period.

---

[5] Dollar Tree, Inc., *2025 Investor Day Presentation* 8 (Oct. 15, 2025).
[6] JOC Staff, *Top 100 Importer/Exporter Rankings: Largest US Shippers Outpace Hot Market,* J. Com. (May 7, 2025).
[7] Dollar Tree, Inc., *Annual Report* (Form 10-K), at 7 (Mar. 16, 2026).
[8] *Id.*

55. Dollar Tree, either directly or through DT Sourcing or Greenbrier International, paid IEEPA tariffs to CBP throughout the Class Period.

56. Dollar Tree has historically conducted its import operations through its subsidiaries DT Sourcing and Greenbrier International. CBP has identified DT Sourcing and Greenbrier International as the importers of record for merchandise imported on behalf of Dollar Tree Stores, and has stated that those entities' customs activities include filing entries and paying duties. Because CBP's IEEPA-refund process provides refunds with respect to the importer's entries through accounts associated with importer-of-record numbers, on information and belief, Dollar Tree received the approximately $369 million directly or through its wholly owned subsidiaries DT Sourcing or Greenbrier International.

57. The merchandise on which these tariffs were paid was acquired for the benefit of the integrated Dollar Tree retail enterprise and sold through stores operated by Dollar Tree Stores.

58. Dollar Tree CEO Michael Creedon would later state that Dollar Tree only "adjusted pricing twice in our history: first, breaking the dollar in 2022; and second, targeted price actions in response to tariffs in 2025."[9]

59. The 2025 price actions began shortly after the IEEPA tariffs went into effect.

60. On March 11, 2025, a post in a subreddit frequented by Dollar Tree employees and customers (r/DollarTree) reported that price increases were scheduled to begin on certain goods later that month. When asked for the source of the information, the poster identified a Dollar Tree "Opscenter message dated 3/10." [10]

---

[9] Dollar Tree, Inc., *Q4 2025 Earnings Call Transcript*, The Motley Fool (Mar. 16, 2026) (emphasis added).

[10] Effective_Dot6785, *Prices Increases Coming*, r/DollarTree (Mar. 11, 2025).

61. By March 14, 2025, moderators had created a dedicated Dollar Tree price-increase mega-thread in response to a "massive influx" of complaints that started coming in.[11]

62. In June 2025, Dollar Tree launched a broader tariff-based repricing initiative that the company came to call the "red stickering initiative."

63. The red stickering initiative worked as follows: Dollar Tree had decided to increase product prices due to tariffs on a wide range of goods, frequently from $1.25 to $1.50 or $1.75, although other price points also were used. However, it could not simply change the price in the point-of-sale system. The old $1.25 price remained physically printed on the merchandise already sitting in stores (sometimes on the packaging, sometimes on an attached tag). And so Dollar Tree directed store employees to cover the preexisting $1.25 prices on merchandise with a round red sticker in the form of a dot. The store would then display the new price on signs, on shelf inserts, or on separate labels. These stickers indicated to customers that prices on goods had risen because of tariffs by a specific, ascertainable amount.

64. Some customers called these "tariff dots" as shown below:

[11] mraid29, *March 2025 Price Increases/Changes Megathread*, r/DollarTree (Mar. 14, 2025).




65. The use of red dots to designate tariff-related price increases continued through the second, third and fourth quarters of 2025.

66. On a December 3, 2025, earnings call, Dollar Tree CFO Stewart Glendinning described the red stickering initiative as "the tariff-related stickering activities."[12]

[12] Dollar Tree, Inc., *Q3 2025 Earnings Call Transcript*, The Motley Fool (Dec. 3, 2025).

67. On a March 16, 2026, earnings call, Dollar Tree CEO Michael Creedon described the program as a "system-wide reset" involving "Dollar Tree price actions in response to tariffs".[13]

68. On that same call, Creedon explained that the red stickering initiative had required the company to spend more than $100 million that year in expenses just to add the red stickers, the explanatory signage, and the new price labels across its thousands of stores. He said the company spent "$30 million for restickering costs" in the fourth quarter of 2025 alone.[14]

69. These figures do not refer to the total amount by which Dollar Tree raised prices due to the IEEPA tariffs—they refer only to the total cost to the company of creating and implementing new stickers, signage and labels to communicate those increased prices across its thousands of stores. The reasonable inference is that Dollar Tree passed through to customers far more than the amount it spent to implement this red stickering initiative, or else Dollar Tree would not have spent money to relabel prices in this manner.

70. Media outlets independently observed Dollar Tree employees covering printed prices with red stickers throughout this period.[15]

71. Public complaints about the tariff-related price increases were widespread. Customers objected to red stickers obscuring printed prices and the new higher prices at checkout. Media reports referred to consumers "panicking" about the price increases.[16] One commenter online said, "People shop there bc it's a place where they can afford things like food [and] even basic meds. Prices going up like that hits big. It's not even a $.10 cent increase but over 50%.

[13] *Q4 2025 Earnings Call Transcript*, supra note 9.
[14] *Id.*
[15] *See, e.g.*, Alex Bitter, *Notice a red sticker on a Dollar Tree item? It means the price is going up*, Business Insider, June 25, 2025; John Matarese & Emily Hanford-Ostmann, *Are Dollar Stores Still Worthwhile Without $1 Prices Anymore?*, Scripps News (Dec. 19, 2025).
[16] Rebekah Harding, "100% He Spoke the Truth": Woman Goes to Dollar Tree for Balloons. Then the Worker Tells Her Something Shocking, Daily Dot (Mar. 18, 2025).

That's no joke."[17] By July and August 2025, viral TikToks were generating millions of views and boycott calls.[18]

72. One self-identified Dollar Tree employee reported that as reports started to emerge of tariffs, customers were "literally bursting into tears as they are checking out with me, telling me that they don't know how they are going to continue to afford food if we raise our prices (we are one of the only grocery stores in like a five mile radius)."[19] Another self-identified Dollar Tree employee observed that many of their customers did not have anywhere else to turn, because they cannot easily reach other stores such as Walmart: "Our EBT customers don't have a lot of choice they are already penny pinching."[20]

73. This reflects the general point that many shoppers at Dollar Tree are struggling economically and are highly cost conscious.

74. A self-identified Dollar Tree merchandise assistant store manager posted to r/DollarTree on August 7, 2025, that "Price increases are because of the tariffs, its [sic] been a nightmare and theyre [sic] not done yet." He further explained that the price increases are "because of the tariffs", and then described that the accelerated re-pricing through the red stickering initiative as "100% the tariffs."[21]

75. When customers asked about the red dots and price increases, Dollar Tree employees would inform them that they were because of the tariffs. One self-identified employee said he or she would tell customers who asked that **"**since most of our products come from Canada

---

[17] *Id.*

[18] Susan LaMarca, "Two Dollar Tree": Shoppers Call for Boycott After Spotting Red Dots All Over Store Shelves, Daily Dot (Aug. 11, 2025).

[19] u/MisterZan25, *So . . . Anybody know when our prices go up?*, Reddit, r/DollarTree (Jan. 20, 2025).

[20] Comment by u/geekydreams, *March 2025 Price Increases/Changes Megathread*, Reddit, r/DollarTree (Mar. 14, 2025).

[21] Comment by lGipsyDanger, *As a Customer, a Few Questions*, Reddit, r/DollarTree (Aug. 7, 2025).

and China, the tariffs being placed on those countries makes goods coming from them more expensive."[22] Another said they would tell customers: "Due to the trade tariffs the prices are going up on all of the products in the store incrementally over the next few months. Since most of our products are pre-priced we have to put red dot stickers on them if you want to know updated price use the scanner in the front of our store."[23] Thus, the red stickers put customers on clear notice that they were paying more as a direct result of tariffs. The red stickers served to designate for customers that products were being walloped with tariff-related price increases of a specific, ascertainable amount.

76. National media outlets reported throughout the Class Period that Dollar Tree was raising prices in response to tariffs—often prompted by statements from the company's own executives. Examples include:

- "Dollar Tree warns of rising prices due to tariffs."[24] (ABC News)
- "Dollar Tree has also been forced to raise prices owing to tariffs."[25] (Fortune)
- Dollar Tree "placed red stickers over the original prices of goods to raise their prices" as part of "tariff-related stickering activities."[26] (Financial Times)
- "Dollar Tree's decision to ditch the everything-for-$1 strategy is helping it weather the tariff storm."[27] (Business Insider)

---

[22] u/DevastatorCenturian, *How do you explain price increases when customers ask?*, Reddit, r/DollarTree (Sept. 6, 2025).
[23] Comment by Quiet_Anxiety9828, *How do you explain price increases when customers ask?*, Reddit, r/DollarTree (Sept. 6, 2025).
[24] *Dollar Tree Raises Prices Amid Rising Costs*, ABC News (Sept. 4, 2025).
[25] Dave Smith, *Dollar Tree Says the Majority of Its New Customers Earn at Least $100,000 a Year*, Fortune (Dec. 4, 2025).
[26] *Americans Head to Dollar Stores as Affordability Crunch Pinches Consumers*, Fin. Times (Dec. 4, 2025).
[27] Alex Bitter, *Dollar Tree's Decision to Ditch the Everything-for-$1 Strategy Is Helping It Weather the Tariff Storm*, Bus. Insider (June 4, 2025).

77. On March 16, 2026, Dollar Tree filed a Form 10-K in which it confirmed that "the volatile tariff environment and the implementation of these mitigation strategies resulted in increased costs, including significant labor and other discrete costs related to price adjustments."[28]

78. In this same filing, Dollar Tree said that "its retail price changes had resulted in increased regulatory and legal risks regarding pricing and price clarity."[29]

79. Dollar Tree substantially raised prices, on many thousands of items, as a direct and proximate result of the unlawful tariffs.

80. The higher prices that consumers paid were largely or wholly a consequence of the tariffs.

81. Dollar Tree's tariff surcharges resulted from companywide sourcing and pricing decisions and were implemented across Dollar Tree's nationwide retail network, raising prices for consumers throughout the United States.

82. Dollar Tree possesses records that would identify its products that were subject to IEEPA tariffs, the amount of the price increases on those goods due to the tariffs, and (in most instances) the customers who purchased those goods.

83. The portion of the purchase price of Dollar Tree's goods that is attributable to the IEEPA tariffs was not part of its ordinary markup, but an identifiable price increment imposed for the purpose of recovering a specific governmental charge that Dollar Tree has since recovered, or will recover, from the government. It was made clear to customers that there was a denominated price increase attributable to tariffs by virtue of the red dots and the price chart showing how much that sticker would affect the price.

---

[28] Dollar Tree, Inc., *Annual Report (Form 10-K)*, at 29 (Mar. 16, 2026).
[29] *Id.* at 20.

84. Absent the imposition of the unlawful IEEPA tariffs, Dollar Tree would not have imposed the tariff-related price increases, and could not have done so in a competitive marketplace.

**III. The Supreme Court Invalidates the IEEPA Tariffs**

85. Shortly after President Trump imposed IEEPA tariffs, lawsuits filed by states and private actors in federal district courts challenged the President's authority to take that action.

86. On information and belief, Dollar Tree was aware that these lawsuits had been filed, that the plaintiffs had begun prevailing on the merits as early as May 2025, and that the lawsuits could have enormous financial consequences for the company.

87. These lawsuits culminated in the Supreme Court's February 20, 2026, decision in *Learning Resources, Inc. v. Trump* (No. 24-1287), in which the Supreme Court invalidated all IEEPA-based tariffs in a 6-3 decision. The Court stated: "We hold that IEEPA does not authorize the President to impose tariffs." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026). The Court declined to specify whether and how previously collected tariffs must be refunded, leaving that issue to lower courts and administrative processes. Justice Kavanaugh's dissent specifically recognized the problem that is now presented here: "The United States may be required to refund billions of dollars to importers who paid the IEEPA tariffs, even though some importers may have already passed on costs to consumers or others." *Id.* at 334–35 (Kavanaugh, J., dissenting).

88. On February 22, 2026, U.S. Customs and Border Protection ("CBP") announced that IEEPA tariff collection would cease as of February 24, 2026.

**IV. Dollar Tree Pursues and Receives Refunds for the Unlawful Tariffs**

89. According to Brandon Lord, the Executive Director of CBP's Trade Programs Directorate, as of March 4, 2026, the total amount of IEEPA tariffs and estimated tariff deposits collected pursuant to IEEPA is approximately $166 billion.[30]

90. Importers ordinarily deposit estimated duties when merchandise enters the United States. CBP subsequently "liquidates" each entry by determining the final amount of duties legally owed.

91. On March 4, 2026, the CIT issued an order directing CBP to liquidate all unliquidated entries without IEEPA duties, and to reliquidate any entries not "finally liquidated" without IEEPA duties.[31]

92. When liquidation or reliquidation establishes that an importer deposited more than it owed, CBP must refund the excess, together with applicable interest. 19 U.S.C. § 1505(b)-(c).

93. On April 20, 2026, CBP launched the Consolidated Administration and Processing of Entries (CAPE) system to process tariff refunds.

94. Only importers of record or the customs broker that filed the entry summaries are permitted to seek tariff refunds through CAPE.

95. CBP has not provided an avenue for consumers to seek a refund from the U.S. government.

96. On March 16, 2026, Dollar Tree filed a Form 10-K saying it was "taking action to preserve our rights to refunds."[32]

---

[30] *Atmus Filtration, Inc. v. United States*, Ct. No. 26-01259, ECF No. 31, at 6 (Ct. Int'l Trade Mar. 6, 2026).
[31] *Atmus*, ECF No. 21, at 2-3.
[32] Dollar Tree, Inc., Annual Report (Form 10-K), at 29 (Mar. 16, 2026).

97. In April 2026, Dollar Tree, either directly or through its wholly owned subsidiaries DT Sourcing or Greenbrier International, submitted claims for IEEPA refunds totaling $379 million.[33]

98. On August 27, 2026, Dollar Tree reported to the SEC that as of August 1, it had received from the U.S. government approximately $369 million in tariff refunds plus $14 million in interest.[34]

99. Dollar Tree has not used any portion of this money to refund Plaintiffs or any of the Members of the Class the sums these customers paid in tariff surcharges on the products the company purchased throughout the Class Period. Nor has Dollar Tree stated that it intends to do so. To the contrary, Dollar Tree has described what it intends to do with the money, and that list did not include paying refunds of any sort to customers.

100. Dollar Tree is the publicly traded parent company that oversees the Dollar Tree enterprise, sets companywide strategy discussed in this Complaint, and reports the consolidated financial results of its wholly owned subsidiaries, including Dollar Tree Stores, DT Sourcing, and Greenbrier International.

101. Dollar Tree Stores is the retail operating company that runs Dollar Tree retail stores, sells merchandise directly to consumers, and implements the prices and in-store pricing programs established for that merchandise and discussed in this Complaint. It operated the Dollar Tree stores at which Plaintiffs purchased the relevant merchandise and implemented at those stores the tariff-related price increases, red-sticker labels, signage, and point-of-sale prices described below. Plaintiffs conferred the tariff-related portion of their purchase payments directly upon Dollar Tree Stores.

---

[33] Dollar Tree, Inc., Quarterly Report (Form 10-Q), at 12 (Aug. 27, 2026).

[34] *Id.*

102. Greenbrier International is a sourcing and purchasing company that selects and acquires merchandise for sale through Dollar Tree stores and participates in the import and customs process for that merchandising. Greenbrier International and DT Sourcing also participated directly in customs matters concerning merchandise sourced for Dollar Tree and Dollar Tree Stores, including obtaining tariff-classification rulings from CBP. On information and belief, with respect to merchandise for which Greenbrier International served as importer of record during the Class Period, Greenbrier International and/or DT Sourcing paid or caused to be paid the IEEPA duties at issue and participated, directly or through their customs broker, in obtaining refunds of those duties.

103. Dollar Tree did not distinguish among Dollar Tree and its subsidiaries when describing the tariff conduct and pricing activities described in this Complaint. Indeed, in SEC filings and public statements, Dollar Tree and its own senior executives consistently referred to its importation of merchandise, its tariff-mitigation and pricing strategies, its pursuit of IEEPA tariff refunds, and its receipt of those refunds, as conduct undertaken by Dollar Tree, without distinguishing among the individual corporate entities involved.

104. Dollar Tree and its wholly owned subsidiaries Dollar Tree Stores, DT Sourcing, and Greenbrier International, acted in concert as parts of the same corporate enterprise in purchasing and importing merchandise, paying the tariffs imposed upon that merchandise, establishing and implementing retail pricing with tariff surcharges to offset those tariff costs, selling the merchandise to consumers, pursuing refunds of the tariffs after they were declared unlawful, and in refusing to refund the surcharges to their customers. The particular allocation of responsibility among Defendants for specific imports, tariff payments, pricing decisions, and refund claims is uniquely within Defendants' possession and control.

**V. Plaintiffs**

105. Within the Class Period, Plaintiffs each made in-store purchases from Dollar Tree of products that were imported from countries subject to IEEPA tariffs and that, on information and belief, were at prices inflated by Dollar Tree's pass-through of IEEPA tariff costs.

106. Plaintiff Alexis Fennessy resides in Newport News, Virginia. She is married with no children. She does not work; her husband is a law enforcement officer. She shopped at one or more Dollar Tree retail stores in Virginia at least once per month during the Class Period, often buying items such as personal hygiene, cleaning supplies, animal supplies, snacks, and home décor. She recalls when the tariffs went into effect, and that is when she noticed prices increases at Dollar Tree to $5.00 or more.

107. Plaintiff Barbara Grazioli resides in Maple Shade, New Jersey. She is married with one child, and works with focus groups. She purchased items at Dollar Tree retail stores at least once per month (on average) during the Class Period. Specifically, she shopped at Dollar Tree retail stores in New Jersey and in Pennsylvania during the Class Period, as she lives in New Jersey and often works in Pennsylvania. She purchased snacks, frozen items, drinks, party supplies, holiday items and decorations. She noticed that prices were going up significantly during the Class Period and that it was a struggle to keep up with the price increases.

108. Plaintiff William Wolf resides in Freedom, Pennsylvania. He works as a resident nurse, has been married to his wife for 30 years, and has three daughters. He shopped at a Dollar Tree retail store in Pennsylvania weekly during the Class Period. Among the items he purchased were dog treats, birthday cards, napkins, snacks, drinks, BBQ supplies and trash bags. He noticed that prices kept rising at Dollar Tree during the Class Period.

109. Plaintiff Christina Hill resides in Amherst, New York. She works at a call center for Spectrum Cable. She shopped at a Dollar Tree retail store in New York roughly every other week during the Class Period, usually spending $20 to $50. Among the items she would purchase

there were decorations, greeting cards, paper products, facial tissues, cleaning products, Christmas items, and make-up. She noticed price hikes during the Class Period.

110. Plaintiff Brian Troesch resides in Chicago, Illinois. He is 60 years old and on disability without a job. He shopped at a Dollar Tree weekly during the Class Period. Some common items he purchased include personal care products, home products, utensils, decorations, and food. He noticed the prices going up dramatically during the Class Period.

111. Plaintiff Parveen Sangha resides in North Royalton, Ohio. She is retired, and her three children live with her. She shopped at a Dollar Tree retail store in Ohio roughly once per month during the Class Period. Among the items she purchased were candy, makeup, cards, cleaning supplies. She noticed prices had gone up across the Dollar Tree store during the Class Period—sometimes to $10.00.

112. Plaintiff Rozaliya Ripa resides in Round Rock, Texas. She shopped at a Dollar Tree retail store in Texas during the Class Period. Among the items she purchased were cleaning products, personal hygiene items, holiday décor, gardening items. She was surprised by the higher prices she observed at Dollar Tree during the Class Period.

113. Plaintiff Mitchah Williams resides in Marietta, Georgia. He works as a property manager at a public storage facility. He lived in on-site housing at the facility. He shopped at Dollar Tree frequently during the Class Period. Among the items he would purchase at Dollar Tree were cleaning products, snacks, batteries, and towels. He noticed that prices started to rise much higher at the cash register at Dollar Tree during the Class Period, and understood that the red stickers meant higher prices.

114. Plaintiff Sharon Manier resides in Riverside, California. She shopped at a Dollar Tree store in California during the Class Period, and she purchased an array of goods that, on information and belief, experienced tariff-related price increases.

115. Plaintiff Dilip Somavarapu resides in Folsom, California. He shopped at a Dollar Tree store in California during the Class Period.

116. Nearly all of Plaintiffs used credit cards or debit cards to make their purchases at Dollar Tree stores during the Class Period.

## CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this action on behalf of themselves, individually, and on behalf of all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4), on behalf of the following class:

> **Nationwide Class:** All persons who made in-store purchases from any Dollar Tree retail store of any consumer good or other item subject to the tariffs imposed under IEEPA, during the period from February 1, 2025, through February 24, 2026.

118. Plaintiffs are bringing claims on behalf of the Nationwide Class for unjust enrichment (Count One), money had and received (Count Two), breach of contract (Count Three), and declaratory relief (Count Nine).

119. Additionally, Plaintiffs ask the Court to certify classes on behalf of consumers in each state in which a given Plaintiff purchased goods, in-store, at Dollar Tree retail stores pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4). For each state, counsel will ask the Court to certify a class as follows:

> **State Classes**: All persons who made in-store purchases from any Dollar Tree retail store in [STATE] of any consumer good or other item subject to the tariffs imposed under IEEPA, during the period from February 1, 2025, through February 24, 2026.

120. Plaintiffs ask that State Classes be certified for the following states: Virginia, New Jersey, Pennsylvania, New York, Illinois, Ohio, Texas, Georgia and California.

121. For the New Jersey, Illinois, Ohio, Texas and California State Classes, this Complaint pleads claims for unjust enrichment (Count One), money had and received (Count

Two), breach of contract (Count Three), violation of the state consumer protection statute (i.e., one of Counts Four to Eight), and declaratory relief (Count Nine).

122. For the New York, Pennsylvania, Georgia and Virginia State Classes, this Complaint pleads claims for unjust enrichment (Count One), money had and received (Count Two), breach of contract (Count Three), and declaratory relief (Count Nine).

123. As an illustration of how each State Class operates, Plaintiff Parveen Sangha purchased goods at a Dollar Tree retail store in the State of Ohio, and therefore, asserts claims for unjust enrichment (Count One), money had and received (Count Two), breach of contract claim (Count Three), violation of the Ohio Consumer Sales Practices Act (Count Six), and declaratory relief (Count Nine), on behalf of a class of Dollar Tree customers who likewise purchased goods at a Dollar Tree retail store in the State of Ohio.

124. Plaintiffs respectfully ask the Court to construe the above requests broadly and flexibly to achieve a just result. Plaintiffs reserve the right to amend or modify the class definition(s), to ask the Court to create subclasses, and to limit the classes or subclasses based on particular issues. Additional customers of Defendants might file subsequently, and Plaintiffs ask the Court to liberally allow additional plaintiffs to join this suit in order to produce a just and full remedy.

125. Plaintiffs reserve the right to propose groupings of states by their laws' shared elements in such a way as to make the litigation manageable while also providing broad relief for similarly situated individuals, or to add classes or subclasses reflecting such groupings, as appropriate based on further factual and legal development and the Court's ruling.

126. The Nationwide Class and State Classes are referred to herein collectively as the "Class," unless otherwise stated.

127. The period from February 1, 2025, through February 24, 2026, is referred to herein as the "Class Period."

128. This action satisfies all of the explicit and implied requirements of Fed. R. Civ. P. 23(a) and Rule 23(b), including numerosity, typicality, adequacy, superiority, predominance and ascertainability.

129. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. Dollar Tree operates more than 9,000 total retail stores nationally, and sells its products to 100 million households across the United States. The Class and each State Class number in the hundreds of thousands or even millions—and far exceeds the number necessary to satisfy Rule 23(a)(1).

130. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs, like every other member of the Class, purchased products in-store from Dollar Tree that were subject to price increases attributable to tariffs, and were injured as a result of paying that elevated price without later receiving reimbursement of the portion of that price attributable to tariffs. Moreover, Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class. Each Plaintiff seeks to represent only consumers whose injuries and rights resemble those of that Plaintiff.

131. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are each committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class or potential subclasses described above. Plaintiffs have retained counsel who are competent and experienced in class action litigation, and counsel has been certified as lead counsel in prior cases.

132. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by certain individual members

of the Class are relatively small compared to the burden and expense of individual prosecution of the complex litigation required to recover from Dollar Tree. It would therefore be impractical for most, if not all, members of the Class to seek relief on an individual basis. Individual litigation could result in thousands or even hundreds of thousands of individual lawsuits, introducing a serious risk of inconsistent or contradictory judgments arising from the same set of facts, and increasing the delay and expense to all parties. As a practical matter, millions of potential claimants would not file and would be deprived of a fair remedy. In contrast, a class action would present few administrative difficulties and a strong process to provide broad relief. A class action provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. It presents no material management difficulties under the circumstances here.

133. **Predominance of Common Questions of Law and Fact**. Numerous questions of law and fact are common to Plaintiffs and all members of the Class. These common questions will result in common answers for all members of the Class that will impact the resolution of the claims on grounds equally applicable to all members of the Class. These common questions, which predominate over any questions affecting only individual members of the Class, include, but are not limited to:

a. Whether Defendants engaged in the policies and practices alleged herein;

b. Whether the higher prices that customers paid at Dollar Tree stores are attributable to IEEPA tariffs;

c. Whether Defendants passed through some or all of the tariffs to consumers in the form of higher prices;

d. Whether Defendants are obligated to return to customers a sum equal to the amount by which Defendants raised prices on goods as a result of and in response to IEEPA tariffs;

e. Whether Defendants privately knew and/or had reason to believe that the IEEPA tariffs would ultimately be determined to be illegal, but nonetheless instituted the policy, practice and pattern of passing through the elevated tariff costs of goods sold to their customers, including Plaintiffs and members of the Class and the associated practice and pattern of giving none of the tariff refunds to those same customers;

f. Whether Defendants' designation of tariff surcharges (via the red stickering initiative), along with Dollar Tree's refusal to return those surcharges after obtaining corresponding refunds from the U.S. government, constitutes a violation of each of the Counts in this Complaint;

g. Whether Defendants acted unfairly, unlawfully, or unconscionably by up-charging consumers in response to tariff-related costs while failing to reimburse consumers upon learning the tariffs were illegal;

h. The measure of damages available to Plaintiffs and the Class due to increased prices caused by Dollar Tree's tariff pass-through; and

i. The appropriate measure of restitution, actual damages, consequential damages, statutory damages, punitive damages, or other forms of relief due to Dollar Tree's conduct.

134. **Ascertainability**. The members of the Class are ascertainable through objective criteria typical of class action practice and procedure, including through Defendants' own transaction, pricing and customer records, along with receipts, credit card records (and similar

purchase records), account histories, or other ordinary proof of purchase. Determining whether a consumer is a Member of the Class does not require an individualized inquiry into subjective intent, knowledge, or reliance, but only a straightforward review of objective purchase and pricing information.

**COUNT ONE**
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Class)**

135. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

136. An equitable claim for unjust enrichment lies where no valid and enforceable contract governs the claim, the plaintiff has conferred a benefit on the defendant, the defendant has knowledge of the benefit and has accepted or retained the benefit conferred, and the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.

137. Neither Plaintiffs nor any member of the Class entered into any valid and enforceable agreement that addresses Defendants' decision to pass through the cost of a tariff and then refuse to return that money even after the tariff was declared unlawful and Defendants recovered those same amounts from the U.S. government.

138. Courts routinely award relief in equity rather than breach of contract where, as here, a retailer refuses to refund consumer payments attributable to the pass-through of government fees or taxes that were later deemed to be unlawful.

139. Defendants designated the goods on which they imposed a tariff surcharge and the amount of the surcharge through the red stickering initiative and the accompanying signage and labels. A red sticker indicated to customers that the price of that item had risen by a specific, ascertainable amount due to IEEPA tariffs.

140. Defendants have knowledge of and have accepted or retained those benefits to the detriment of Plaintiffs and members of the Class, and at their expense.

141. Plaintiffs and the members of the Class conferred a direct and ascertainable benefit on Defendants in the form of additional money paid through tariff-inflated prices on goods subject to the IEEPA tariffs.

142. Defendants have not returned these amounts to the customers who paid them, even after receiving refunds from the U.S. government or receiving reasonable assurances that Defendants would be fully reimbursed for the same tariff costs that Defendants passed through to Plaintiffs and members of the Class. Defendants are thereby obtaining a double recovery for sums they already passed through to Plaintiffs and members of the Class.

143. Defendants are willfully, knowingly and intentionally choosing not to return those amounts to Plaintiffs.

144. But for the imposition of the IEEPA tariffs, Defendants would not have incurred the tariff costs at issue and would not have imposed the corresponding tariff-related price increases on Plaintiffs and members of the Class.

145. Plaintiffs and members of the Class have no mechanism through the customs-refund process to recover the tariff costs that Defendants passed through to them.

146. Defendants knew of and voluntarily accepted the benefits conferred by Plaintiffs and the Class. Defendants' own public statements and earnings disclosures make clear that Defendants made willful, knowing and intentional decisions to raise prices on goods due to the illegal tariffs.

147. Plaintiffs and the Class paid the tariff-inflated prices directly to Dollar Tree Stores, and Dollar Tree and Dollar Tree Stores received and retained those payments. No third party stands

between Plaintiffs' payment of the tariff-inflated price and Defendants' receipt of the benefit for which Plaintiffs and the Class seek restitution or other remedies.

148. Defendants are continuing to retain those payments, even though they have now received approximately $383 million in refunds and interest from the U.S. government for the unlawful IEEPA tariffs.

149. Even if Defendants have not received a complete recovery from the U.S. government thus far, they must return to Plaintiffs and the Class the sums they have already received, as well as any future sums Defendants receive from the U.S. government. On information and belief, Defendants received more than 95% of the tariff refunds that they sought.

150. It would be unjust and inequitable for Defendants to retain both (1) the increased charges attributable to tariffs that Defendants collected from Plaintiffs and the Class through inflated retail prices and (2) government refunds corresponding to those same unlawful tariffs.

151. This double recovery—from consumers and from the government for some or all of the identical costs that Defendants incurred—offends the principles of equity and good conscience that are the basis for the unjust enrichment cause of action.

152. Plaintiffs do not seek restitution of the full purchase price of the affected goods under this Count, nor do they contend that Defendants were unjustly enriched merely because they earned revenue or profit from those transactions. Plaintiffs seek only the portion of the purchase price attributable to tariff costs that Defendants passed through to consumers and that Defendants subsequently recovered from or will recover from the United States (or a U.S. agency or government-controlled process).

153. The amount of the price increase passed through to Plaintiffs and members of the Class is ascertainable through Defendants' records, through discovery, and through fact-finding by a jury.

154. Plaintiffs and the Class are entitled to restitution, disgorgement, and such other relief as is available under the law or the Court deems appropriate.

155. The foregoing allegations state a claim for unjust enrichment against Defendants under the law of each State in which Dollar Tree owns or operates a retail store. In the alternative, the foregoing allegations state a claim for unjust enrichment under the law of many States in which Dollar Tree owns or operates a retail store.

156. This claim is pleaded in the alternative to Plaintiffs' breach of contract count (Count Three).

## COUNT TWO
**Money Had and Received**
**(On behalf of Plaintiffs and the Class)**

157. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

158. Money had and received is an equitable cause of action that lies where Defendants received money that in equity and good conscience should be returned to Plaintiffs.

159. Defendants received money from Plaintiffs and from each Member of the proposed Class in the form of higher prices due to the pass-through of IEEPA tariff costs.

160. Defendants benefited from their receipt of these amounts because the tariff-related portion of the prices paid by Plaintiffs and the members of the Class reimbursed or offset costs Defendants had incurred in paying the IEEPA tariffs.

161. Defendants imposed the tariff-related price increases in order to offset, recover, or defray the additional costs they incurred as a result of paying the IEEPA tariffs on imported merchandise.

162. Defendants designated the goods on which they imposed a tariff surcharge and the amount of the surcharge through the red stickering initiative and the accompanying signage and

labels. A red sticker indicated to customers that the price of that item had risen by a specific, ascertainable amount due to IEEPA tariffs.

163. Plaintiffs and the Class paid the tariff-inflated prices directly to Dollar Tree Stores, and Defendants received and retained those payments. No third party stands between Plaintiffs' payment of the tariff-inflated price and Defendants' receipt of the benefit for which restitution is sought.

164. But for the imposition of the IEEPA tariffs, Defendants would not have incurred the tariff costs at issue and would not have imposed the corresponding tariff-related price increases on Plaintiffs and the Class.

165. Defendants have received approximately $383 million in refunds and interest for the invalidated IEEPA tariffs from the U.S. government.

166. Even if Defendants have not received a complete recovery from the U.S. government thus far, they must return to Plaintiffs and the Class the sums they have already received, as well as any future sums Defendants receive from the U.S. government. On information and belief, Defendants have received more than 95% of the tariff refunds that they sought.

167. Defendants know that the governmental refunds correspond to tariff costs that they previously passed through, in whole or in part, to consumers, yet have retained the resulting duplicate recovery and have neither returned the money nor offered to return the corresponding amounts to Plaintiffs and the Class.

168. Defendants are now retaining both the amounts collected from their customers to offset those unlawful tariff costs and the governmental refunds of those same costs. Those amounts are money that, in equity and good conscience, belongs and ought to be returned to Plaintiffs and the members of the Class.

169. Defendants owe Plaintiffs and the members of the Class an ascertainable amount equal to the tariff-related price increases paid by them for which Defendants have received corresponding reimbursement from the United States.

170. Plaintiffs do not seek restitution of the full purchase price of the affected goods; Plaintiffs seek only the portion of the purchase price attributable to tariff costs that Defendants passed through to consumers and that Defendants subsequently recovered from the government.

171. Plaintiffs and the Class are entitled to recover from Defendants such sums, together with prejudgment interest.

172. The foregoing allegations state a claim for money had and received against Defendants under the law of each State in which Dollar Tree and/or Dollar Tree Stores own or operate a retail store. In the alternative, the foregoing allegations state a claim for money had and received under the law of many States in which Defendants own or operate a retail store.

173. This claim is pleaded in the alternative to Plaintiffs' breach of contract claim (Count Three).

## COUNT THREE
**Breach of Contract**
**(On behalf of Plaintiffs and the Class)**

174. Plaintiffs hereby incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

175. This Count is pleaded in the alternative pursuant to Rule 8(d). If the Court determines that an enforceable contract governed the parties' rights and obligations with respect to the allegations in this Complaint, then Defendants have breached that contract as set forth below.

176. Any contract entered into by each of the Plaintiffs (and the members of the Proposed Class) and Defendants only allowed Defendants to charge, collect, or retain lawful, valid, and authorized duties, tariffs, or related surcharges.

177. No written or verbal proposal or offer by either Plaintiffs or Defendants authorized Defendants to charge, collect, or retain unlawful, invalid, or unauthorized duties, tariffs, or fees.

178. If the Court decides that any relevant contract governs the applicable transactions, nothing in such contract or applicable law permits a company to charge, collect, or retain unlawful, invalid, or unauthorized duties, tariffs, or fees.

179. Defendants' conduct breached the implied covenant of good faith and fair dealing inherent in any contract by failing to pass along to the consumers any refund of tariffs that Defendants received or will receive for sums that Defendants already passed through to consumers. In other words, if there is a contract, that contract should be construed as requiring Defendants to refund passed-through price increases attributable to illegal tariffs.

180. Defendants designated the goods on which they imposed a tariff surcharge and the amount of the surcharge through the red stickering initiative and the accompanying signage and labels. A red sticker indicated to customers that the price of that item had risen by a specific, ascertainable amount due to IEEPA tariffs.

181. Defendants acted in a manner that is unconscionable by imposing tariff-inflated price increases across thousands of goods and then retaining the resulting amounts even after the tariffs were declared unlawful and the U.S. government refunded the corresponding tariff amounts to Defendants.

182. Defendants' conduct deprived Plaintiffs and the members of the Class of the benefits of the bargain, which was to pay only lawful and authorized charges and not to be charged sums that were later adjudicated to be based on illegal tariffs for which Defendants were or would be reimbursed.

183. Plaintiffs and the Class suffered ascertainable losses as a direct and proximate result of Defendants' conduct, including but not limited to the amounts they paid in tariff-related surcharges and/or inflated prices.

184. The foregoing allegations state a claim for breach of contract (as an alternative claim) under the law of each State in which Dollar Tree and/or Dollar Tree Stores own or operate a retail store. In the alternative, the foregoing allegations state a claim for breach of contract (as an alternative remedy) under the law of many States in which Defendants own or operate a retail store.

**COUNT FOUR**
**Violation of New Jersey Consumer Fraud Act,**
**N.J.S. 56:8-1 et seq.**
**(on behalf of Plaintiff Barbara Grazioli**
**and the New Jersey State Class)**

185. Plaintiff Barbara Grazioli hereby realleges and incorporates the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further alleges as follows.

186. Defendants engaged in an unconscionable commercial practice or other unlawful conduct in violation of N.J.S. 56:8-2, by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that they had shifted onto consumers (in the form of higher prices) even after the Supreme

Court had declared the tariffs unlawful and Defendants had received refunds of those sums;

d. Undertaking a scheme where they raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

187. The aforementioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

188. Plaintiff and members of the New Jersey State Class suffered ascertainable losses as a direct and proximate result of Defendants' unlawful conduct, including the amounts they paid in tariff-inflated prices.

189. There is no consumer or competitive benefit to allowing Defendants to keep both (1) the surcharge that they charged to consumers because of passed-through tariff-related costs and (2) the refund from the U.S. government.

190. Defendants have received approximately $383 million in refunds and interest for the invalidated IEEPA tariffs from the U.S. government.

191. Defendants' practices were willful, knowing and intentional, as Defendants purposefully raised consumer prices in response to tariff costs while simultaneously positioning themselves to obtain government refunds for those same costs; and Defendants are now choosing not to return the ill-gotten gains to consumers with full knowledge and purpose that they have pursued and now obtained a double recovery.

192. Plaintiff Grazioli and the members of the New Jersey State Class suffered injury in fact as a direct and proximate result of Defendants' unlawful practices.

193. Plaintiff Grazioli and the members of the New Jersey State Class are entitled to treble damages, together with reasonable attorneys' fees, filing fees, costs of suit, and such other relief as is available under the law or the Court deems appropriate.

**COUNT FIVE**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**
**(On behalf of Plaintiff Brian Troesch and the Illinois State Class)**

194. Plaintiff Brian Troesch hereby realleges and incorporates the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further alleges as follows.

195. Defendants engaged in an unfair act or practice by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that they had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Defendants had received refunds of those sums;

d. Undertaking a scheme where they raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

196. The aforementioned conduct offends public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and causes substantial injury to consumers who have no avenue to seek a refund from the government directly.

197. Plaintiff Troesch and members of the Illinois State Class suffered ascertainable losses as a direct and proximate result of Defendants' unlawful conduct, including the amounts they paid in tariff-inflated prices.

198. There is no consumer or competitive benefit to allowing Defendants to keep both (1) the surcharge that they charged to consumers because of passed-through tariff-related costs and (2) the refund from the U.S. government.

199. Defendants' acts or practices occurred in the course of trade or commerce.

200. Defendants' acts or practices were willful, knowing and intentional, as Defendants purposefully raised consumer prices in response to tariff costs while simultaneously positioning themselves to obtain government refunds for those same costs; and Defendants are now choosing not to return the ill-gotten gains to consumers with full knowledge and purpose that they have pursued and now obtained a double recovery.

201. Plaintiff Troesch and the members of the Illinois State Class suffered injury in fact and actual pecuniary loss as a direct and proximate result of Defendants' unlawful practices.

202. Plaintiff Troesch and the members of the Illinois State Class are entitled to actual economic damages, punitive damages, together with reasonable attorneys' fees, filing fees, costs of suit, and such other relief as is available under the law or the Court deems appropriate.

**COUNT SIX**
**Violation of Ohio Consumer Sales Practices Act**
**Ohio Revised Code § 1345.01 et seq.**
**(On behalf of Plaintiff Parveen Sangha**
**and the Ohio State Class)**

203. Plaintiff Parveen Sangha hereby realleges and incorporates the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further alleges as follows:

204. Defendants engaged in an unfair act under Ohio Revised Code § 1345.02, an unconscionable act under § 1345.03, or another covered transaction, by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that they had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Defendants had received refunds of those sums;

d. Undertaking a scheme where they raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

205. The aforementioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

206. There is no consumer or competitive benefit to allowing Defendants to keep both (1) the surcharge that they charged to consumers because of passed-through tariff-related costs and (2) the refund from the U.S. government.

207. Defendants have received approximately $383 million in refunds and interest for the invalidated IEEPA tariffs from the U.S. government.

208. Defendants' conduct is a consumer transaction that occurred in the course of trade or commerce.

209. Defendants' conduct affects the public interest, given that vast numbers of consumers are affected by Defendants' unfair practices.

210. Defendants' practices were willful, knowing and intentional, as Defendants purposefully raised consumer prices in response to tariff costs while simultaneously positioning themselves to obtain government refunds for those same costs; and Defendants are now choosing not to return the ill-gotten gains to consumers with full knowledge and purpose that they have pursued and now obtained a double recovery.

211. Plaintiff Sangha and the members of the Ohio State Class suffered ascertainable losses as a direct and proximate result of Defendants' unlawful conduct, including the amounts they paid in tariff-related surcharges and/or inflated prices.

212. Plaintiff Sangha and the members of the Ohio State Class suffered injury in fact, loss of money, and the loss occurred as a result of the unlawful, unfair or deceptive acts or practices.

213. Plaintiff Sangha and the members of the Ohio State Class are entitled to the rescission of the transaction; actual economic damages; attorneys' fees and costs; and such other relief as is available under the law or the Court deems appropriate.

**COUNT SEVEN**

**Violation of Texas Deceptive Trade Practices-Consumer Protection Act,**

**Texas Bus. & Com. Code §§ 17.41 et seq.**
**(On behalf of Plaintiff Rozaliya Ripa**
**and the Texas State Class)**

214. Plaintiff Rozaliya Ripa hereby realleges and incorporates the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further alleges as follows.

215. Defendants engaged in an unconscionable action or course of action by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that they had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Defendants had received refunds of those sums;

d. Undertaking a scheme where they raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

216. The aforementioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

217. Plaintiff Ripa and the members of the Texas State Class are consumers who sought or acquired goods or services by purchase or lease, with those goods or services forming the basis of the complaint.

218. There is no consumer or competitive benefit to allowing Defendants to keep both (1) the surcharge that they charged to consumers because of passed-through tariff-related costs and (2) the refund from the U.S. government.

219. Defendants have received approximately $383 million in refunds and interest for the invalidated IEEPA tariffs from the U.S. government.

220. The transactions at issue were consumer transactions that occurred in the course of trade or commerce.

221. Defendants' conduct affects the public interest, given that vast numbers of consumers are affected by the companies' unfair practices.

222. Defendants' practices were willful, knowing and intentional, as Defendants purposefully raised consumer prices in response to tariff costs while simultaneously positioning themselves to obtain government refunds for those same costs; and Defendants are now choosing not to return the ill-gotten gains to consumers with full knowledge that they have pursued and now obtained a double recovery.

223. Plaintiff Ripa and the members of the Texas State Class incurred ascertainable losses as a direct and proximate result of Defendants' unlawful conduct, including the amounts they paid in tariff-related surcharges and/or inflated prices.

224. Plaintiff Ripa and the members of the Texas State Class suffered injury in fact, loss of money, and the loss occurred as a result of the unlawful or unconscionable acts or practices.

225. Plaintiff Ripa and the members of the Texas State Class are entitled to restoration of the money; economic damages; treble damages; attorneys' fees and costs; and such other relief as is available under the law or the Court deems appropriate.

**COUNT EIGHT**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 et seq.**
**(On Behalf of Plaintiffs Sharon Manier,**
**Dilip Somavarapu and the California State Class)**

226. Plaintiffs Sharon Manier and Dilip Somavarapu hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

227. Defendants engaged in unlawful and/or unfair business acts or practices under California law by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that they had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Defendants had received refunds of those sums;

d. Undertaking a scheme where they raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from

consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

228. There is no consumer or competitive benefit to allowing a company simultaneously to keep both the elevated consumer price charged to consumers and the government refund.

229. Defendants' conduct occurred in the course of trade or commerce.

230. Defendants' conduct affects the public interest, given that vast numbers of consumers in California are affected by Defendants' unfair practices.

231. Defendants' unfair practices were willful, knowing and intentional, as Defendants purposefully raised consumer prices in response to tariff costs while simultaneously positioning themselves to obtain government refunds for those same costs; and Defendants are now choosing not to return the ill-gotten gains to consumers (i.e., the price increases derived from passing through illegal tariffs) with full knowledge that they have pursued and obtained a double recovery.

232. Defendants have received approximately $383 million in refunds and interest for the invalidated IEEPA tariffs from the U.S. government.

233. Plaintiffs and the members of the California State Class suffered ascertainable losses as a direct and proximate result of Defendants' unlawful conduct, including the amounts they paid in tariff-related surcharges and/or inflated prices.

234. Plaintiffs and the members of the California State Class suffered damages, including injury in fact and loss of money, which occurred as a result of the unlawful, unfair or deceptive acts or practices.

235. The above-mentioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

236. By prosecuting this action, Plaintiffs seek to enforce important California consumer-protection rights and to halt and remedy a uniform practice affecting a large class of California consumers. The relief sought in this action will confer substantial pecuniary benefits upon the Class and the consuming public, including by restoring money obtained through the challenged practice and preventing its continuation, and by deterring the retention of funds stemming from unlawful tariffs by thousands of other companies across California. The affected consumers' individual losses are too small to support separate litigation, while the cost and complexity of establishing Defendants' uniform conduct substantially exceed any individual Plaintiff's financial stake. Plaintiffs therefore seek reasonable attorneys' fees under Code of Civil Procedure § 1021.5 and all other applicable laws.

237. Plaintiffs and the California State Class are entitled to the restitution of all monies from the collection of tariff charges, which were unjustly acquired through acts of unfair competition, and such other relief as is available under the law.

## COUNT NINE
**Declaratory Relief, 28 U.S.C. § 2201**
**(On behalf of Plaintiffs and the Class)**

238. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

239. Plaintiffs allege this claim individually and on behalf of the proposed Class.

240. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

241. Plaintiffs' claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Defendants.

242. Plaintiffs have suffered an injury by Defendants' unlawful retention of the tariff refund.

243. Plaintiffs and the Class request that this Court exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiffs and the Class and for which Defendants received corresponding tariff refunds is unlawful for the above-stated reasons, and that Defendants are obligated to return to Plaintiffs and the Class all IEEPA tariffs passed on to consumers through higher prices with interest.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the proposed Class, respectfully request that this Court enter judgment in their favor and against Defendants and grant the following relief:

A. An order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; appointing Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel; and directing that notice of this action be given to members of the Class;

B. An order that Defendants' actions violate the state consumer protection laws and common law principles pled in this Complaint, and that Defendants are obligated to return to Plaintiffs and the members of the Class all IEEPA tariffs passed through to customers in the form of higher prices, with interest, on sums Defendants received or have received from the federal government to reimburse Defendants for unlawful IEEPA tariffs;

C. An award to Plaintiffs and the Class of (a) restitution and disgorgement, (b) actual damages, (c) consequential damages, (d) treble damages, (e) statutory damages, (f) punitive damages, and/or (g) any other damages authorized under law, in the amount to be determined at trial;

D. An award of pre-judgment and post-judgment interest;

E. An award to Plaintiffs and the Class of reasonable attorneys' fees and costs;

F. An order directing an accounting of all IEEPA tariff surcharges collected from consumers and all IEEPA tariff refunds received or anticipated to be received from the U.S. government;

G. Such other and further legal and equitable relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 3, 2026

*/s/ Frank J. White*

Frank J. White (Virginia Bar No. 91168)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Phone: (415) 421-7100
Fax: (415) 421-7105
fwhite@schneiderwallace.com

Jason H. Kim (*pro hac vice forthcoming*)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
515 S. Figueroa Street, Suite 1060
Los Angeles, CA 90071
Tel: (415) 421-7100
jkim@schneiderwallace.com

Todd M. Schneider (*pro hac vice forthcoming*)
Raymond S. Levine (*pro hac vice forthcoming*)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
tschneider@schneiderwallace.com
relevine@schneiderwallace.com

Noah A. Messing (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel: (212) 960-3720
nm@messingspector.com

Phillip M. Spector (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
145 West Ostend Street, Suite 600
Baltimore, MD 21230
Tel: (212) 960-3720
ps@messingspector.com

*Attorneys for Plaintiffs*